UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PHILLIP DICKERMAN,                         )
                                           )
                Plaintiff,                 )
                                           )
        v.                                 )        3:11-cv-239-RCJ-VPC
                                           )
DON HELLING and ROBERT LEGRAND,            )        **ORDER**
                                           )
                Defendants.                )
                                           )
_____   )

        Currently before the Court is Defendants' Motion for Summary Judgment (#15).  The

Court heard oral argument on May 29, 2012.

                            **BACKGROUND**

**I.      Complaint**

        In April 2011, Plaintiff Phillip Dickerman ("Plaintiff") filed a complaint against Don Helling

and Robert LeGrand (collectively "Defendants").  (Compl. (#1) at 1).  The complaint stated that

Plaintiff was suing Defendants in their individual capacities.  (*Id.*).

        The complaint alleged the following.  Plaintiff had been employed with the Nevada

Department of Corrections ("NDOC") as a Senior Correctional Officer for nine and half years.

(*Id.*).  In January 2010, Defendants proposed terminating Plaintiff's employment.  (*Id.*).  At a

pre-disciplinary hearing, the hearing officer disagreed with the termination recommendation

and recommended a suspension.  (*Id.* at 1-2).  Plaintiff accepted a 10-day suspension without

pay and Defendants agreed that Plaintiff had not been at fault for the incident.  (*Id.* at 2).  The

incident had involved an inmate who had sued.  (*Id.*).  Defendant Helling had felt compelled

to pay $600 to settle the inmate's civil rights lawsuit and Helling blamed Plaintiff for the

settlement which led to the proposed termination. (*Id.*).  Plaintiff alleged that he was entitled to a reimbursement for the 10-days in which he was denied pay for his suspension. (*Id.*).

The complaint alleged that, in August 20, 2010, Plaintiff was investigated by Defendants for leaving his duty post without authorization. (*Id.*).  On September 28, 2010, Plaintiff was placed on administrative leave and terminated on November 29, 2010. (*Id.*).  On February 17, 2011, a hearing officer ordered Plaintiff reinstated with full back pay and benefits. (*Id.*).  Defendants refused to impose back pay and instead imposed a 30-day suspension. (*Id.*).  Because of Defendants' history of retaliation Plaintiff did not return to duty for fear of further retaliation. (*Id.* at 2-3).  Plaintiff asserts that he had the right to testify as a witness in the inmate's lawsuit and the right to present his case before the pre-disciplinary hearing officer. (*Id.* at 3).  Helling was upset how the matter turned out and suspended Plaintiff which constituted an adverse employment action. (*Id.*).

Plaintiff alleged two causes of action. (*Id.*).  In the first cause of action, Plaintiff alleged First Amendment retaliation pursuant to 42 U.S.C. § 1983. (*Id.* at 3-4).  Plaintiff alleged that he had engaged in speech on a matter of public concern and that his speech and petitioning activities were not part of his job duties. (*Id.* at 4).  He asserted that he had suffered adverse employment actions for those activities. (*Id.*).  In the second cause of action, Plaintiff sought injunctive relief and requested that the Court "enjoin Defendant Helling in his official capacity to revoke the ten-day suspension." (*Id.*).  Plaintiff alleged that he had suffered emotional distress, mental anguish, harm to his reputation, harm to his career, humiliation, embarrassment, loss of enjoyment of life, and lost wages, benefits, and seniority. (*Id.* at 3).  Plaintiff asserted that he had mitigated his damages by taking a job with the Pershing County Sheriff's Office but continued to suffer a wage loss differential of $13,000 per year. (*Id.*).

**II.     Summary Judgment Facts**

**A.     Second Specificity of Charges**

In his affidavit, Robert LeGrand stated that he was the Warden at the NDOC Lovelock Correctional Center ("LCC"). (LeGrand Aff. (#15-2) at 2).  He was appointed Acting Warden at LCC on May 3, 2010, and was appointed Warden on August 9, 2010. (*Id.*).  During 2010,

1   up until his termination on November 29, 2010, Plaintiff worked at LCC as a Senior

2   Correctional Officer.  (*Id.*).  LeGrand had signed the Specificity of Charges that had terminated

3   Plaintiff from state service and had written the letter informing Plaintiff of his appeal rights.

4   (*Id.*).

5          On September 28, 2010, LeGrand sent Deputy Director Don Helling an adjudication

6   report concerning the three allegations against Plaintiff.  (Adjudication Report (#15-3) at 27).

7   The first allegation stated that Plaintiff had engaged in neglect of duty for leaving an assigned

8   post while on duty without authorization from a supervisor, a Class 5 violation.  (*Id.* at 28).

9   LeGrand recommended that this allegation be sustained (the act occurred).  (*Id.* at 12, 28).

10  LeGrand reasoned that, during the investigation, Plaintiff had admitted that he had departed

11  the facility on August 10, 2010, at 5:35 p.m. without being relieved by another staff member

12  or notifying the on-duty shift supervisor.[1]  (*Id.* at 28).  Plaintiff had stated in his report that he

13  should have called the on-duty supervisor to find out if he could leave or find out whether a

14  relief officer was going to be provided because Plaintiff had known that "all traffic coming into

15  and going out of the facility [had been] rerouted through [Plaintiff's] sally port" due to a

16  malfunctioning of the gates at the gatehouse.  (*Id.*).  Plaintiff had been aware that personnel

17  were relieved at 6 p.m.  (*Id.*).

18         The second allegation stated that Plaintiff had engaged in neglect of duty for

19  jeopardizing the security of the institution, a class 5 violation, when he abandoned his security

20  post with the knowledge that persons were still entering and leaving LCC via that gate.  (*Id.*

21  at 28-29).  LeGrand recommended that this allegation be classified as sustained.  (*Id.* at 29).

22  LeGrand reasoned that the gatehouse gates went inoperable at 5:10 p.m. and that Plaintiff

23  had admitted that he had been notified that all foot traffic would be redirected to the Tower 3

24  Sally Port to enter and exit the facility for shift change.  (*Id.*).  LeGrand stated that, after being

25  notified, Plaintiff was aware that the Tower 3 Sally Port was going to be the main entrance and

26  exit for the facility and that Plaintiff was the "primary deterrent to any unauthorized personnel

27

28

---

[1] Plaintiff's shift was from 6 a.m. to 6 p.m.  (Del Porto Ltr. (#15-3) at 16).

1  or inmates entering or departing the facility." (*Id.*).  At that time, Plaintiff had become

2  responsible for the identification of all persons entering and exiting the facility. (*Id.*).  Plaintiff

3  chose to abandon his post and leave the institution, leaving the responsibility to a probationary

4  employee from a vantage point of approximately 60 feet in the air on a catwalk.  (*Id.*).

5  Plaintiff's actions left the institution vulnerable to the possibility of escape. (*Id.*).

6      The third allegation stated that Plaintiff had engaged in neglect of duty for failure to

7  perform security functions, a class 4 violation, when he abandoned his post without relief from

8  staff or the permission of a supervisor.  (*Id.*).  LeGrand recommended that the allegation be

9  sustained.  (*Id.*).  LeGrand reasoned that one of the security functions on the institution was

10 to identify all persons entering and leaving and that when Plaintiff left his post at 5:30 p.m. he

11 left an unseasoned officer on the catwalk to that security task. (*Id.*).  Plaintiff, as the seasoned

12 officer, did not take the responsibility of his post seriously.  (*Id.* at 30).

13     LeGrand recommended that Plaintiff be terminated from service because Plaintiff had

14 committed two Class 5 violations and one Class 4 violation;  knew that the Tower 3 Sally Port

15 had become the main entry and exit to and from LCC (a major population institution of

16 approximately 1600 medium and close custody inmates), and had made a conscious decision

17 to abandon his security post without notifying anyone. (*Id.*).

18     On November 15, 2010, LeGrand sent Plaintiff a Specificity of Charges #1082 letter.

19 (Nov. Specificity of Charges (#15-3) at 2).  The letter stated that the department had decided

20 to terminate Plaintiff from service effective on November 29, 2010, and that he had 10 working

21 days to appeal the disciplinary action from the effective date of his termination.  (*Id.*).

22     Plaintiff testified to the following in his deposition.  (Dickerman Depo. (#15-4) at 8).

23 There were two Specificity of Charges.  (*Id.* at 21).  In the first Specificity of Charges, Plaintiff

24 did not file an appeal, but instead went to a pre-disciplinary hearing and requested that the

25 termination be overturned, which it was.  (*Id.*).  Plaintiff alleged that the severity of his second

26 Specificity of Charges was in retaliation for him reducing his first Specificity of Charges from

27 a termination to a 10-day suspension.  (*Id.*).

28     Plaintiff testified that his First Amendment retaliation claim was based on the following

speech. (*Id.* at 25).  First, Plaintiff had spoken to LeGrand and Acting Associate Warden Sandie on August 11, 2010, the day after he left early from work. (*Id.* at 25-26). Plaintiff had called LeGrand over to the sally port and they discussed what kind of discipline Plaintiff could expect. (*Id.* at 26). Plaintiff said, "Hey, Warden . . . I left early. I might have screwed up. What kind of disciplinary am I looking at?" (*Id.* at 27). LeGrand said, "Don't worry. You are not going to lose your job.  I have concerns because a supervisor wasn't present . . . We'll move on from here." (*Id.*). Plaintiff responded, "All right.  Thank you, sir.  Have a good day." (*Id.*).

Second, within a week following August 10, 2010, Plaintiff approached Sandie and asked Sandie "to be forthright, to be truthful" at what Plaintiff was looking at. (*Id.* at 28). Plaintiff specifically said, "Sandie, what am I . . . Be honest with me.  What am I looking at?" (*Id.* at 30). Plaintiff was referring to what type of discipline was he looking at. (*Id.*). Sandie said, "Warden LeGrand and myself are not going after your job . . . maybe your stripe . . . But if others get involved, there's nothing I can do." (*Id.* at 28-29). The stripe referred to a demotion. (*Id.* at 29).     Plaintiff admitted that a Class 5 violation resulted in dismissal. (*Id.* at 29).

Third, Plaintiff had to fill out reports regarding grievances with inmates. (*Id.* at 32). If a case worker came to him, he was required, as part of his job responsibilities, to write a detailed explanation of what happened and describe what the inmate is referring to. (*Id.*). The grievance Plaintiff was referring to was when an inmate complained that fecal matter had been left on the inmate's door. (*Id.* at 33). Plaintiff had filled out two reports and NDOC had claimed that he had lied between the two reports. (*Id.* at 35). The written reports involved the discipline of the inmates who were responsible for the fecal matter and the other inmate who had filed a grievance about the fecal matter ending up in his cell. (*Id.* 38-39). Those reports were done in the course and scope of Plaintiff's job. (*Id.* at 40).

Fourth, Plaintiff referred to his speech contained in Adam Watson's pre-disciplinary hearing report regarding the inmate incident. (*Id.*).  The report reflected the statements Plaintiff had made during the pre-disciplinary hearing about what had happened with the fecal

matter incident.  (*Id.*).

Fifth, Plaintiff referred to speech he had made before a personnel hearing officer, Louis Ling, after NDOC had terminated him.  (*Id.* at 42-43).  Plaintiff specifically referred to Ling's order and decision stating that Plaintiff had not been completely without fault when Plaintiff failed to notify anybody that he was leaving.  (*Id.* at 43).  Upon clarification, Plaintiff said that, at that hearing, he had told the personnel hearing officer about the conversations that he had had with LeGrand and Sandie after the August 10, 2011, incident.  (*Id.* at 44).

Sixth, after the first Specificity of Charges, Adam Watson had ordered Plaintiff back to work and placed in the gatehouse.  (*Id.* at 45).  On three separate occasions, then-Warden Palmer had approached him and told Plaintiff that he needed to get the settlement agreement signed.  (*Id.*).  Plaintiff told Palmer that he had been trying to get a hold of his attorney to find out where the paperwork was.  (*Id.*).

Seventh, while working at the gatehouse after the first Specificity of Charges, LeGrand, who was an associate warden at the time, told Plaintiff the first week he had been back "to lay low; not to make any waves; basically, just out of sight, out of mind type of thing; not to make any waves; not to make any trouble; basically, to hide."  (*Id.* at 47).  Plaintiff responded, "yes, sir, that was my intention."  (*Id.*).  Plaintiff explained it was his intention to not make any waves and to get the target off his back because he knew he had a target on his back.  (*Id.*).  Plaintiff knew he had a target on his back because "[i]t was a thing known to officers that . . . in a sense, beat a termination, you are going to have a target on your back and they are going to be looking at any way to get rid of you."  (*Id.*).  Plaintiff interpreted LeGrand's statement to lay low and hide as a statement that there was a target on his back.  (*Id.* at 47-48).

With respect to Plaintiff's second cause of action, Plaintiff thought that Helling should revoke his 10-day suspension because NDOC had used his 10-day suspension as a catalyst for his second Specificity of Charges.  (*Id.* at 49).  Plaintiff admitted that he never asked for the 10-day suspension or the first Specificity of Charges to be removed from his file.  (*Id.* at 49-50).  With respect to Plaintiff's petitioning activity, Plaintiff stated that it involved him appealing his first discipline that he had signed a settlement agreement for.  (*Id.* at 54).

On February 17, 2011, after a hearing, Hearing Officer Louis Ling found that NDOC had terminated Plaintiff without just cause and set the termination aside.  (2011 Hearing Officer Order (#15-5) at 2, 13).  The hearing officer ordered NDOC to reinstate Plaintiff immediately and ordered Plaintiff to receive full pay and benefits for the period he had been terminated.  (*Id.* at 13).  After reviewing the evidence and holding a hearing, the hearing officer found that there was "substantial, credible, and probative evidence" that Plaintiff's departure of LCC on August 10, 2010, did not constitute a "clear and serious security threat" or an "egregious security breach."  (*Id.* at 10).

The hearing officer found that Plaintiff had "acted selfishly and without regard for operational convenience and efficiency of LCC and without regard for the inconvenience that his absence would work on his fellow employees who were undergoing shift change."  (*Id.* at 13).  The hearing officer found that, although Plaintiff deserved to be disciplined for his selfishness and poor judgement, he did not commit the offenses that NDOC had ultimately charged him with.  (*Id.*).

On May 18, 2011, NDOC sent Plaintiff a letter informing Plaintiff that his dismissal from service had been reversed and that he would be receiving back pay.  (Reinstatement Ltr. (#15-6) at 2).  The letter informed Plaintiff that he was expected to report to duty Sunday, May 22, 2011.  (*Id.*).

On May 20, 2011, Plaintiff submitted a resignation from state service with an effective date of May 22, 2011.  (Resignation Ltr. (#15-7) at 2).

### B.  First Specificity of Charges

On December 30, 2009, then-Warden Palmer sent Deputy Director Don Helling an adjudication report concerning allegations against Plaintiff concerning incidents that took place in December 2007 and January 2008.  (Adjudication Report (#15-8) at 9-10).  The first allegation stated that on January 3, 2008, Plaintiff had engaged in false and misleading statements in written reports in response to a request for information by an official investigator, a Class 5 violation.  (*Id.* at 10).  The allegations stated that Plaintiff's written reports had differed from each other and that Palmer had recommended that the allegation be sustained.

1
2
3
4
5
6

(*Id.*).  Palmer reasoned that in one report, Plaintiff stated that he had been passing in front of cell 69 and noticed an envelope with fecal matter inside and had disposed of the envelope and had proceeded to cell 72.  (*Id.*).  In another report, Plaintiff stated that he had picked up the envelope that had a specified inmate's name on it.  (*Id.*).  Plaintiff believed that the envelope had fallen out of that inmate's door slot and had placed the envelope in the door slot when he noticed it contained fecal matter.  (*Id.*).

7
8
9
10

The second allegation stated that on December 22, 2007, Plaintiff engaged in unbecoming conduct when he smeared fecal matter on one of the inmate's doors, a Class 2 violation.  (*Id.*).  Palmer recommended that the allegation be sustained.  (*Id.*).  Palmer recommended termination from state service.  (*Id.* at 11).

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

On March 15, 2010, Associate Warden Adam Watson wrote a letter to Director Howard Skolnick and then-LCC Warden Jack Palmer, which stated that Watson had conducted a pre-disciplinary hearing with Plaintiff and Plaintiff's attorney.  (Watson Ltr. (#15-9) at 2).  Watson found that the case had hinged on a false statement made on an official NDOC record–specifically, what was submitted on a Notice of Charges to an inmate and a more detailed incident report regarding the incident.  (*Id.* at 4).  The differences had resulted in the basis of an inmate lawsuit in federal district court and had forced NDOC to settle monetarily with the inmate and had caused embarrassment before a federal judge over a false statement from a sworn peace officer.  (*Id.*).  Watson found that technically there had been a false report authored in the case, the Notice of Charges.  (*Id.*).  The inmate had seized on the discrepancy and had run with it.  (*Id.*).  Watson found that Plaintiff's initial report was vague and had substantially differed from the incident report.  (*Id.*).  Plaintiff vehemently had denied the issue of intentional dishonesty and he and his lawyer had asserted that it was short and sloppy. (*Id.*).  Watson found that Plaintiff had violated the regulations stated in the specificity of charges but found that there had been mitigating factors.  (*Id.*).  Watson recommended that the termination be reduced to a suspension.  (*Id.*).

27
28

In March 2010, Plaintiff, his attorney, and NDOC entered into a settlement agreement effective April 5, 2010.  (Settlement Agreement (#15-10) at 2-3).  The settlement agreement

stated that NDOC agreed to rescind the proposed disciplinary of termination from service and change the sanction to 10 working days without pay to be taken after the effective date. (*Id.* at 2). The Agreement was not to be construed as an admission of liability or wrongdoing on the part of either party. (*Id.*). Plaintiff agreed to accept the 10-working day suspension. (*Id.*). In consideration for entering into the Agreement, Plaintiff would waive his appeal rights pertaining to the 10-working day suspension. (*Id.*). NDOC agreed to modify the Specificity of Charges to reflect a 10-working day suspension. (*Id.*). Plaintiff agreed to release and relinquish any and all claims, rights, or entitlements arising out of the facts and incident which had led to the Agreement and agreed to waive any right to back pay related to the Agreement. (*Id.* at 3).

## LEGAL STANDARD

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to Fed.R.Civ.P. 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

1  fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  Once the moving party has properly supported the

2  motion, the burden shifts to the nonmoving party to come forward with specific facts showing

3  that a genuine issue for trial exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

4  U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  "The mere existence of a

5  scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

6  evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252,

7  106 S.Ct. at 2512.  The nonmoving party cannot defeat a motion for summary judgment "by

8  relying solely on conclusory allegations unsupported by factual data."  *Taylor v. List*, 880 F.2d

9  1040, 1045 (9th Cir. 1989).  "Where the record taken as a whole could not lead a rational trier

10  of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita*, 475

11  U.S. at 587, 106 S.Ct. at 1356.

12  **DISCUSSION**

13  Defendants assert that Plaintiff cannot establish First Amendment retaliation because

14  Plaintiff cannot demonstrate that his speech qualified as one of public concern.  (Mot. for

15  Summ. J. (#15) at 9).  Defendants assert that Plaintiff's attempt to create an action under the

16  Petition Clause also fails because Plaintiff has failed to demonstrate that his petition relates

17  to a matter of public concern.  (*Id.* at 17).  Defendants also argue that Plaintiff's claim for

18  injunctive relief fails because Plaintiff signed a settlement agreement consenting to the 10-day

19  penalty.  (*Id.* at 19).

20  In response, Plaintiff argues that the case is a wrongful termination case.  (Opp'n to

21  Mot. for Summ. J. (#17) at 1).  He argues that his speech was of a matter of public concern

22  because it concerned potential or actual discrimination by government agencies or officials.

23  (*Id.* at 3).  He argues that he had a right to present facts at the inmate's lawsuit and that a

24  "reasonable inference" exists that Helling disapproved of Plaintiff's speech because it required

25  Helling to pay to settle the inmate's suit.  (*Id.*).  Plaintiff asserts that a "reasonable inference"

26  exists that Helling was upset that Plaintiff's terminations were overturned.  (*Id.* at 4). He

27  asserts that there was a "reasonable inference" that the adverse employment actions were

28  motivated by Plaintiff's speech and petitioning activity.  (*Id.*).  He asserts that because the

1   hearing officer vacated the second termination as unwarranted the termination was pretextual.

2   (*Id.*).

3       In support of his opposition to the motion for summary judgment, Plaintiff attaches three

4   partial deposition transcripts of Defendant Helling, Defendant LeGrand, and Lieutenant Sandi.

5   (*Id.* at 7).   In Defendant Helling's deposition, he testified to the following.   (Helling Depo. (#17)

6   at 10).   With respect to the fecal matter incident, Warden Palmer had conducted the

7   adjudication and had recommended termination.   (*Id.* at 11).   Helling concurred with the

8   recommendation.   (*Id.*).   After Adam Watson conducted a hearing, Watson said there were

9   problems between the different reports but said that Plaintiff should be given the benefit of the

10  doubt and given a suspension instead of a termination.   (*Id.*).   The inmate incident was settled

11  for $600.   (*Id.* at 12).   Helling stated that, although he concurred with the termination

12  recommendation, he could have recommended a lesser discipline.   (*Id.* at 15).

13      With respect to LeGrand and Sandi's deposition transcripts, Plaintiff only submits one

14  page from each deposition.   (*See* LeGrand Depo. (#17) at 19; *see* Sandi Depo. (#17) at 23).

15  There is not enough context to the excerpts to understand what LeGrand and Sandi are

16  testifying to.   (*See id.*).

17      Defendants filed a reply.   (Reply to Mot. for Summ. J. (#18)).

18  **I.    Claim One:  First Amendment Retaliation & Petition Clause**

19      To sustain an action under 42 U.S.C. § 1983, a plaintiff must show that (1) the conduct

20  complained of was committed by a person acting under color of state law, and (2) the conduct

21  deprived the plaintiff of a federal constitutional or statutory right.  *Jensen v. City of Oxnard*, 145

22  F.3d 1078, 1082 (9th Cir. 1998).   In this case, the parties do not dispute that Defendants acted

23  under color of state law, but instead focus on the alleged constitutional violation.

24      **A.    First Amendment Retaliation**

25  A First Amendment retaliation claim against a government employer involves:

26  a sequential five-step series of questions: (1) whether the plaintiff spoke on a
    matter of public concern; (2) whether the plaintiff spoke as a private citizen or
27  public employee; (3) whether the plaintiff's protected speech was a substantial
    or motivating factor in the adverse employment action; (4) whether the state had
28  an adequate justification for treating the employee differently from other

members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  The plaintiff bears the burden of showing steps one, two, and three.  *Id.* at 1070-71.  If the plaintiff has passed the first three steps, the burden shifts to the government to establish steps four and five.  *Id.* at 1071.

With respect to the first step, speech involves a matter of public concern when "it can fairly be considered to relate to any matter of political, social, or other concern to the community."  *Id.* at 1070 (internal quotations omitted).  However, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern."  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (internal quotations omitted).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Eng*, 552 F.3d at 1070.

In this case, Plaintiff identified seven areas of speech in his deposition in which he claims First Amendment Retaliation.  The first speech took place on August 11, 2010, when Plaintiff asked Defendant LeGrand, "Hey Warden . . . I left early.  I might have screwed up.  What kind of disciplinary am I looking at?"  (*See* Dickerman Depo. (#15-4) at 26-27).  This speech is not a matter of public concern because Plaintiff only asked about the possible discipline he faced after leaving his post the day before which constitutes a personnel dispute.

The second speech took place the following week when Plaintiff asked Lt. Sandie "what am I . . . Be honest with me.  What am I looking at?" in reference to possible discipline he faced after leaving his post.  (*See* Dickerman Depo. (#15-4) at 30).  This speech is not a matter of public concern because Plaintiff only asked about the possible discipline he faced for leaving his post which constitutes a personnel dispute.

The third speech involved filling out reports related to inmate grievances.  (*See* Dickerman Depo. (#15-4) at 32).  In those reports, Plaintiff had to explain what had happened and describe the incident that the inmate had complained about.  (*See id.*).  These reports

were not matters of public concern because they were reports that dealt with internal grievances within the prison system.

The fourth speech involved Plaintiff's speech contained in Adam Watson's pre-disciplinary hearing report regarding Plaintiff's version of what had happened during the inmate fecal matter incident. (*See* Dickerman Depo. (#15-4) at 40). This speech also does not contain a matter of public concern because Plaintiff was giving speech that concerned an internal personnel dispute about whether he had lied on two different reports about the fecal matter incident.

The fifth speech involved statements he made to Louis Ling, a hearing officer, after NDOC had terminated him for leaving his post. (*See* Dickerman Depo. (#15-4) at 42-43). Plaintiff specifically stated that he retold the hearing officer about his conversations with LeGrand and Sandie after the August 10, 2011, incident. (*See id.* at 44). As discussed above, Plaintiff only asked LeGrand and Sandie about what possible discipline he was facing after he had left his post, an internal personnel dispute, and does not constitute a matter of public concern.

The sixth speech involved then-Warden Palmer telling Plaintiff that he needed to get the settlement agreement involving the fecal matter incident signed and Plaintiff responding that he had been trying to get hold of his attorney to find out where the paperwork was. (*See* Dickerman Depo. (#15-4) at 45). This is not a matter of public concern because Plaintiff's speech only involved discussions pertaining to the internal personnel dispute regarding his two conflicting reports regarding the fecal matter incident.

Finally, the seventh speech involved Plaintiff telling Defendant LeGrand that it was "[his] intention" to lay low after the fecal matter incident. (*See* Dickerman Depo. (#15-4) at 47). This is not a matter of public concern because it involved an internal personnel dispute involving the fecal matter incident. As such, none of Plaintiff's proffered speech is a matter of public concern and therefore Plaintiff fails to establish a First Amendment violation. Because there is no First Amendment violation, the Court grants Defendants' motion for summary judgment (#15) on the First Amendment retaliation claim.

### B.    Petition Clause

Plaintiff also attempts to raise a petition clause retaliation claim based on the appeal of his first disciplinary incident in which he ultimately signed a settlement agreement for.  (*See* Compl. (#11) at 3-4; Dickerman Depo. (#15-4) at 54).

In *Borough of Duryea, Pa. v. Guarnieri*, __ U.S. __, 131 S. Ct. 2488, 180 L. Ed. 2d 408 (2011), the Supreme Court held that courts apply the same "matter of public concern" framework to First Amendment Petition Clause claims as the courts do in First Amendment Speech Clause claims.  *Id.* at __, 131 S.Ct. at 2500.  The Supreme Court has held that "whether an employee's petition relates to a matter of public concern will depend on the content, form, and context of the petition, as revealed by the whole record."  *Id.* at __, 131 S.Ct. at 2501 (internal quotations and alterations omitted).  "The forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern."  *Id.*  "A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context."  *Id.*

In this case, Plaintiff's petition did not involve a matter of public concern.  Plaintiff used an internal grievance procedure to appeal his termination regarding the fecal matter incident, which ultimately led to Plaintiff's reinstatement and a 10-day suspension.  As such, Plaintiff does not state a petition clause violation and the Court grants summary judgment (#15) on the petition clause claim.

Accordingly, the Court grants summary judgment (#15) on the first cause of action with prejudice.

## II.    Claim Two:  Injunctive Relief

Plaintiff's complaint alleges that the Court should require Defendant Helling to revoke Plaintiff's 10-day suspension on the fecal matter incident based on his First Amendment claim.  (*See* Compl. (#1) at 4).  As discussed above, there is no First Amendment Retaliation claim.  Additionally, in Plaintiff's settlement agreement he agreed to serve a 10-day suspension.  As such, Plaintiff has stated no legal basis for injunctive relief.  Accordingly, the Court grants

14

1    Defendants' motion for summary judgment on the second cause of action with prejudice.

2                                    **CONCLUSION**

3            For the foregoing reasons, IT IS ORDERED that Defendants' Motion for Summary

4    Judgment (#15) is GRANTED in its entirety with prejudice.

5            The Clerk of the Court shall enter judgment accordingly.

6

7        DATED:  This 6th day of July, 2012.

8

9                                    _____
                                     United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28